

ENTERED
05/16/2017

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **ULTRA PETROLEUM CORP., *et al*** | § | **CASE NO: 16-32202** |
| **Debtor(s)** | § | |
| | § | **CHAPTER 11** |
| | § | |
| **DOYLE HARTMAN, *et al*** | § | |
| **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 16-3250** |
| | § | |
| **ULTRA PETROLEUM CORP., *et al*** | § | |
| **Defendant(s)** | § | |

**MEMORANDUM OPINION**

Doyle and Margaret Hartman filed this adversary proceeding against Ultra Petroleum Corporation *et al* seeking to recover a percentage of Ultra's gains attributable to its oil and gas hedging transactions. The Hartmans allege that hedging gains must be included within their net profits interest, which was created by the 1954 Pinedale Unit Area Net Profits Contract (the "Pinedale Contract"). Ultra moved to dismiss the Hartmans' complaint and amended complaint under FED. R. CIV. P. 12(b)(6) as to their hedging claim; Ultra's motion to dismiss argues that the Pinedale Contract precludes recovery of hedging gains by the Hartmans. All parties agreed to treat Ultra's Rule 12(b)(6) motion to dismiss as a motion for partial summary judgment. The Hartmans subsequently filed a cross motion for summary judgment in which they argue that Ultra's hedging gains should be included in the calculation of their net profits interest.

Ultra's motion for partial summary judgment is granted. The Hartmans' cross motion is denied.

**Background**

Effective April 1, 1954, Malco Refineries, Inc., El Paso Natural Gas Company, and Continental Oil Company (the "First Parties") entered into the Pinedale Contract with Novi Oil Company. (ECF No. 36-2; ECF No. 2 at 5). Under the Pinedale Contract, Novi assigned its working interest in four leases within the Pinedale Unit Area of Sublette County, Wyoming, to the First Parties in exchange for a sum representing 5% of the First Parties' net profits. (ECF No. 36-2; ECF No. 2 at 5). The Pinedale Contract computes net profits "on the basis of all operations under the Pinedale Unit applicable to said leases." (ECF No. 36-2 at 1). "Net profits" is defined in the Pinedale Contract as "the gross revenue . . . from unit operations allocable to said leases after deduction of all expenses of unit operations . . . except those charged to the working interest owners." (ECF No. 36-2 at 2).

Gross revenue for oil and gas is computed by taking "into account the proceeds of production sold for delivery at the wellhead." (ECF No. 36-2 at 2). "As to production not so sold, the fair market value of such production at the wellhead shall be taken into account; provided, however, that as to gas the value to be taken into account shall be equivalent to the price that Continental is entitled to receive for its share of gas under the provisions of that certain agreement by and between Continental and El Paso entitled 'Option to Purchase Gas Agreement.'" (ECF No. 36-2 at 2).

Under the Option to Purchase Gas Agreement, until sufficient reserves were developed and a pipeline created to transport gas out of the local area, El Paso held "an option to purchase all of Continental's interest in gas produced from the subject lands." (ECF No. 36-8 at 4). "If El Paso is selling the gas in one temporary market, it shall pay Continental for Continental's gas the wellhead price El Paso is receiving for the gas, if sold at the wellhead, or if not sold at the

wellhead, a wellhead price consistent with the price El Paso is obtaining for such gas." (ECF No. 36-8 at 6–7). If El Paso sells Continental's gas at different prices, it shall pay Continental "a wellhead price equal to the weighted average wellhead price El Paso is receiving . . . or if not sold at the wellhead, a wellhead price consistent with the average price El Paso is receiving, weighted by volume." (ECF No. 36-8 at 7). If El Paso and Continental elected to buy and sell gas amongst each other according to the model Gas Purchase Agreement included in the Option to Purchase Gas Agreement, the purchase price would be "the market value at the delivery point." (ECF No. 36-8 at 24).

The Pinedale Contract requires the First Parties to issue payments of net profits "whenever it shall appear at the end of such month that net profits have been realized as a result of operations under said leases, taking into consideration all expenses theretofore incurred in connection with such operations." (ECF No. 36-2 at 4).

Ultra eventually became a successor in interest to the First Parties while the Hartmans became successors in interest to Novi. (ECF No. 27 at 7; ECF No. 35 at 9). As of 2006, 22 of the 62 original leases covered by the Pinedale Contract were still in place. *Ultra Res., Inc. v. Hartman*, 226 P.3d 889, 902 (Wyo. 2010). Today, the Hartmans own a 2.49% net profits interest that burdens leases in the Pinedale Field. (ECF No. 2 at 6; ECF No. 2 at 3).

In May 2005, the remaining leases burdened by the Pinedale Contract became profitable. *Hartman*, 226 P.3d at 902. Consequently, the Hartmans sent a letter to Ultra on February 22, 2006, stating that they owned a net profits interest and demanding payment and an accounting of their interest. *Id.* After Ultra failed to meet their demands, on March 31, 2006, the Hartmans brought suit in Wyoming state court. *Id.* The Hartmans' complaint asserted multiple claims for relief, including a declaratory judgment as to the validity of the net profits interest under the

Pinedale Contract, a breach of the Pinedale Contract by Ultra, and a breach of Ultra's duty of good faith and fair dealing. *Id.* at 903. After a bench trial, the district court granted the Hartmans' summary judgment motion on the following issues, amongst others: the successors to the First Parties—Ultra—breached their obligations under the Pinedale Contract; Ultra owed $4,896,589.00 on the net profits interest; Ultra was liable to the Hartmans for unpaid net profits; and Ultra remained obligated under the Pinedale Contract for accounting and payment of the net profits interest. *Id.* at 904.

Ultra subsequently appealed the district court's determination. *Id.* On appeal, the Supreme Court of Wyoming affirmed the state district court's ruling in part and reversed and remanded in part for proceedings consistent with its opinion. *Id.* at 940. The Wyoming Supreme Court found that the district court properly ruled that the net profits interest continued to encumber the still existing and relevant leases, that the Hartmans sufficiently proved their ownership of the net profits interest to entitle them to payment from Ultra, and that the non-operating Ultra defendants breached the Pinedale Contract. *Id.* at 939. However, the Wyoming Supreme Court also concluded that the district court made several errors in its damages award to the Hartmans, particularly by concluding that produced gas used on the burdened leases was to be included as revenue for the net profits calculation under the Pinedale Contract. *Id.* at 940. Accordingly, the Wyoming Supreme Court reversed and remanded the district court's damages award for recalculation. *Id.*

The Hartmans filed a second lawsuit in Wyoming district court in order to enforce the Wyoming Supreme Court's and district court's judgments against Ultra and challenge Ultra's proffered net profits interest accounting in post-appeal proceedings. *Hartman v. Ultra Resources, Inc.*, 2014 WL 4647857 (2014). Ultra appealed the district court's orders on the

merits of the Hartmans' claims issued in the second lawsuit, including an order refusing to allow Ultra to charge expenses invoiced prior to January 1, 2007, to the calculation of the net profits interest starting January 1, 2007. *Ultra Res., Inc. v. Hartman*, 346 P.3d 880, 886 (Wyo. 2015). The Wyoming Supreme Court affirmed the district court's orders, finding that the district court's interpretation of the Pinedale Contract was correct in regards to when expenses were "incurred" under the contract. *Id.* at 906.

Neither proceeding brought by the Hartmans in regards to the Pinedale Contract and their net profits interest dealt with the interpretation of the Pinedale Contract's revenue provisions, or whether revenue from hedge transactions should be included in the calculation of the Hartmans' net profits interest. (ECF No. 35 at 10).

On April 29, 2016, Ultra filed a voluntary chapter 11 bankruptcy petition. Case No. 16-32202. The Hartmans filed Proof of Claim 157 in Ultra's chapter 11 bankruptcy on August 23, 2016; Proof of Claim 157 asserts multiple claims against Ultra, including one for allegedly underreported revenue realized from Ultra's hedge transactions. (ECF No. 27 at 9). On November 7, 2016, the Hartmans filed this adversary proceeding to recover monies allegedly due to them from Ultra under their net profits interest after Ultra refused to include in the net profits interest accounting the full fixed-price hedge gains received from net profits interest-burdened lease production. Case No. 16-03250. (ECF No. 2 at 23).

The Hartmans' adversary proceeding specifically seeks to: determine the true status of the net profits interest account for the net profits interest accounting period beginning January 1, 2007; declare the parties' rights and obligations with respect to the proper method of net profits interest accounting; determine that the gross revenue for the net profits interest should include the amount of overriding royalties paid to any of the First Parties; determine the parties' rights

and obligations with respect to the audits of the total net profits interest revenues received and expenses incurred on the net profits interest-burdened leases; determine Ultra's obligations to provide the Hartmans with all requested information related to producing operations and exploratory work on the net profits interest-burdened leases; recover damages for any net profits that accrued under a correct net profits interest accounting for the accounting period beginning April 29, 2016; and recover interest, attorney's fees, costs, expenses, and statutory penalties due to the Hartmans. (ECF No. 2 at 3).

Ultra moved to dismiss the Hartmans' adversary proceeding under FED. R. CIV. P. 12(b)(6) on December 19, 2016. (ECF No. 27). In its motion to dismiss, Ultra argued that the Pinedale Contract's terms are unambiguous and do not provide the Hartmans with any interest in Ultra's separate and purely financial hedging agreements. (ECF No. 27 at 13). Particularly, Ultra's hedging gains are not proceeds of production sold for delivery at the wellhead nor the fair market value of such production at the wellhead sold downstream, as provided for in the Pinedale Contract to compute gross revenue. (ECF No. 27 at 11; ECF No. 36-2 at 2). Instead, Ultra argues that the hedging agreements are purely financial transactions that are completely separate from the oil and gas from which they derive their value. (ECF No. 27 at 12). *Cimarex Energy Co. v. Chastant*, 537 F. App'x 561, 565 (5th Cir. 2013). A contrary interpretation of the Pinedale Contract, in Ultra's opinion, contravenes well established federal and state case law. (ECF No. 27 at 17). Consequently, net profits under the Pinedale Contract, connected to production from actual operations on the properties burdened by the net profits interest, do not include Ultra's hedging gains or losses. (ECF No. 27 at 14).

At the Court's suggestion, the parties to this adversary proceeding agreed to convert Ultra's motion to dismiss to a motion for partial summary judgment. (ECF No. 36 at 5). On

February 27, 2017, the Hartmans filed a response to Ultra's converted motion for partial summary judgment. (ECF No. 35). The Hartmans' response argued that the Pinedale Contract's unambiguous purpose was to compensate Novi—and consequently the Hartmans—for its contribution of significant oil and gas mineral interests by allowing it to share in the net profits from oil and gas production. (ECF No. 35 at 2). Because of this purpose, the Hartmans alleged that the Court could not allow Ultra to enter into fixed-price hedge contracts in order to assure itself of revenue while denying the Hartmans their proportional share of such revenue. (ECF No. 35 at 2). Additionally, Ultra could not charge the Hartmans for all of the capital expenditures related to production of oil and gas from the net profits interest leases, including development, recovery, and marketing expenses, without providing them with their fair share of *all* revenue connected with Ultra's production under the net profits interest leases in any shape or form. (ECF No. 35 at 3).

Ultra submitted a reply to the Hartmans' response on March 21, 2017. (ECF No. 36). In its reply, Ultra reiterated that the Pinedale Contract unambiguously defines gross revenue as the fair market value of *natural gas actually sold at the wellhead* when computing the Hartmans' net profits interest. (ECF No. 36 at 3). Ultra argues that this definition of gross revenue contrasts with the purely financial nature of Ultra's hedge transactions that do not entail any delivery nor changing of title in oil or gas. (ECF No. 36 at 2). Consequently, Ultra asserted that it is entitled to a judgment that interprets the "plain" language of the Pinedale Contract to conclude that revenue from hedge transactions is not includable in the net profits calculation. (ECF No. 36 at 36).

On April 3, 2017, the Court entertained oral arguments on Ultra's converted motion for partial summary judgment; the Court took this matter under advisement at the conclusion of oral arguments.

**Jurisdiction**

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

**Legal Standard**

***Applicable Procedural and Substantive Law***

Federal courts apply federal law to procedural matters. *See Trautmann v. Cogema Mining, Inc.*, 2007 WL 1577652, at *3 (S.D. Tex. May 30, 2007) (applying federal summary judgment law to plaintiffs' breach of contract, negligence, and trespass claims under the Erie doctrine) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996)); *see also Royal Surplus Lines Ins. Co. v. Brownsville Indep. Sch. Dist.*, 404 F. Supp. 2d 942, 947–48 (S.D. Tex. 2005) ("Rule 56 of the Federal Rules of Civil Procedure governs the propriety of summary judgment in the present case, not Rule 166a(i) of the Texas Rules of Civil Procedure."). Rule 56 of the Federal Rules of Civil Procedure accordingly governs the validity of Ultra's motion for partial summary judgment in this case.

However, when a proceeding in federal court involves solely questions of state substantive law, the federal court applies the relevant state substantive law. *See Illinois Cent. R. Co. v. Mayeux*, 301 F.3d 359, 362 (5th Cir. 2002); *see also Gasperini*, 518 U.S. at 427; *Royal Surplus Lines Ins. Co.*, 404 F. Supp. at 947–48 (applying Texas insurance law in a diversity action). Because this proceeding focuses solely on a contract interpretation dispute in regards to

oil and gas production from properties in Wyoming, the Court applies Wyoming substantive law in this adversary proceeding. (ECF No. 36-2 at 1; ECF No. 27 at 6).

***Summary Judgment Standard***

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). FED. R. BANK. P. 7056 incorporates FED. R. CIV. P. 56 in adversary proceedings. A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In cases involving the interpretation of a contract, summary judgment is only appropriate where the language of the contract is unambiguous. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Cooper Indus., LLC v. Precision Castparts Corp.*, 2016 WL 4939565, at *6 (S.D. Tex. Sept. 14, 2016).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Ben-Levi v. Brown*, 136 S. Ct. 930 (2016). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*,

136 S. Ct. 1715 (2016).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2). Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24. The

non-moving party must cite to specific evidence demonstrating a genuine dispute. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the non-movant bears the burden of proof on an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 325. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Id.* at 324. The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

***Wyoming Standards on Contract Interpretation***

Under Wyoming contract law, a court's primary focus when interpreting a contract is the parties' intent. *Ultra Res., Inc. v. Hartman*, 226 P.3d 889, 905 (Wyo. 2010); *Carlson v. Flocchini Invs.*, 106 P.3d 847, 854 (Wyo. 2005). Courts must interpret contracts as a whole, "reading each provision in light of all the others to find the plain and ordinary meaning of the words." *State ex rel. Arnold v. Ommen*, 201 P.3d 1127, 1138 (Wyo. 2009). If an agreement is in writing and its language is clear and unambiguous, courts recognize the words of the agreement to be the parties' intentions. *Boley v. Greenough*, 22 P.3d 854, 858 (Wyo. 2001).

In interpreting an unambiguous mineral interests contract, courts must consider and give effect to all of the contract's provisions so that no part of the contract is rendered meaningless. *Id.* at 859. The language expressed in the parties' agreement must be given effect in accordance

with the meaning reasonable persons at the time and place of the agreement would give that language. *Hartman*, 226 P.3d at 905; *Moncrief v. Louisiana Land & Expl. Co.*, 861 P.2d 516, 524 (Wyo. 1993). Courts should consider the circumstances surrounding the execution of the agreement in order to determine the parties' intentions, even if the agreement is unambiguous. *Hartman*, 226 P.3d at 905. However, "the context cannot be invoked to contradict the clear meaning of the language used." *State v. Pennzoil Co.*, 752 P.2d 975, 978 (Wyo. 1988).

If a court determines that a contract conveys a double or obscure meaning, the court should conclude that the contract is ambiguous. *Hartman*, 226 P.3d at 905. "The determination of whether a contract is ambiguous is a matter of law for the court to decide, regardless of whether or not the parties agree as to the contract's meaning." *Id.* Parol evidence of the parties' intent is considered only if a contract is ambiguous. *Id.* A contract's silence on a particular issue does not create an ambiguity in every instance, but silence on a "matter naturally within the scope of the contract" gives rise to ambiguity. *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1173 (10th Cir. 1999) (quoting *Cheyenne Mountain Sch. Dist. v. Thompson*, 861 P.2d 711, 715 (Colo. 1993)). "If the meaning of a contract is ambiguous or not apparent, it may be necessary to use evidence in addition to the contract itself in order to determine the intention of the parties. In such instances, interpretation of the contract becomes a mixed question of law and fact." *Wadi Petroleum, Inc. v. Ultra Res., Inc.*, 65 P.3d 703, 708 (Wyo. 2003).

**Analysis**

At issue in this proceeding is whether the gains or losses attributable to Ultra's hedging transactions are properly excluded from the revenue side of the calculation of the Hartmans' net profits interest under the Pinedale Contract. The Court finds that the Pinedale Contract does not

include gains or losses from Ultra's hedge transactions. The hedging revenues are properly excluded from the calculation of the Hartmans' net profits interest.

The nature of a net profits interest is "determined from the instrument creating the interest." *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 976 (Wyo. 1994). The Pinedale Contract specifically computes net profits "on the basis of all operations under the Pinedale Unit applicable to said leases." (ECF No. 36-2 at 1). Likewise, net profits under the Pinedale Contract are defined as the gross revenue from unit operations allocable to the net profits interest-burdened leases, taking into account the proceeds of oil and gas production sold for delivery at the wellhead. (ECF No. 36-2 at 2). For non-wellhead sales of gas, the Pinedale Contract's definition of gross revenue takes into account the amount Continental, one of the First Parties, was entitled to receive for its share of gas under the Option to Purchase Gas Agreement; such a share would be calculated using the "market value at the delivery point." (ECF No. 36-2 at 2; ECF No. 36-8 at 24). The Wyoming Supreme Court expressly recognized the limitation of the Hartmans' net profits interest to *unit operations*. *Hartman*, 226 P.3d at 907–08. Consequently, the gains or revenue from hedge transactions must constitute an operation under the Pinedale Unit in order for the hedging gains to be included in the calculation of the Hartmans' net profits interest.

Since approximately 2007, Ultra has entered into fixed-price hedge transactions in the normal course of its business. (ECF No. 2 at 19; ECF No. 35 at 10). Ultra engages in hedging in order to minimize its exposure to the volatile and unpredictable prices of oil and gas in the marketplace. (ECF No. 27 at 12). In turn, such transactions provide Ultra with a level of certainty to its production revenues and cash flow that then supports its capital intensive drilling and completion programs. (ECF No. 2 at 20). Ultra is not alone in this use of hedging in order

to minimize risk. *See, e.g.*, *Cimarex Energy Co. v. Chastant*, 537 F. App'x 561, 565 (5th Cir. 2013) (discussing Cimarex Energy Company's utilization of hedging transactions in order to protect itself against fluctuations in prices on production of oil and gas). Overall, genuine hedging transactions are purely financial, derivative transactions. *Id.* As such, a disconnect exists between the price for which actual gas production may be sold at the wellhead or downstream and the price assumptions involved in a hedge. (ECF No. 27 at 11). Consequently, hedges do not affect the market value of oil or gas at the well or on leased property. *Chastant*, 537 F. App'x at 565.

Ultra's hedging transactions do not rely upon nor do they involve physical operations to extract or produce gas under the Pinedale Unit. (ECF No. 36 at 14); *see also* Wyo. Stat. § 30-5-401(iv) ("'Oil and gas operations' means the surface disturbing activities associated with drilling, producing and transporting oil and gas, including the full range of development activity from exploration through production and reclamation of the disturbed surface."). Instead, Ultra's hedges are financial swap contracts that are purely financial, derivative transactions meant to protect Ultra from the volatility of the oil and gas markets. (ECF No. 36 at 12). These hedges realize profits or losses based upon the fixed price "bets" that Ultra and various financial institutions agree upon, not upon the fair market value of the gas Ultra produces and sells at the wellhead or downstream. (ECF No. 36 at 15). Because Ultra's hedges do not affect the market value of the gas at the well or on the leased property nor generate any profits from actual production at the wellhead, the Court finds that the gains or losses from these transactions should not be included in the computation of the Hartmans' net profits interest. Instead, the calculation

of net profits under the Pinedale Contract takes into account only the revenue from sales of real gas production or the fair market value of production at the wellhead.[1]

This interpretation of the Pinedale Contract's language precludes the Hartmans' additional argument that the language of Section 3 of the Pinedale Contract and the Supplemental Accounting Agreement support the inclusion of hedging gains in the calculation of the Hartmans' net profits interest. The Hartmans specifically argue that Section 3 of the Pinedale Contract contemplates that Ultra's gross receipts, upon which their net profits interest is calculated, refers to the total amount of money or value of other considerations that Ultra receives from selling oil and gas, which they allege would include hedging gains. (ECF No. 35 at 19–20). The Hartmans also assert that the Supplemental Account Agreement makes no mention of index prices or market value for oil and gas, confirming that gross revenue and the net profits interest are based on *all* amounts received by Ultra for its oil and gas under the accounting procedures adopted by the parties. (ECF No. 35 at 22).

However, Section 3 is part of the Pinedale Contract. As set forth above, when the Pinedale Contract is viewed as a whole, it excludes proceeds Ultra received from its fixed-price hedges in the calculation of the Hartmans' net profits interest. The Hartmans' Section 3 argument is unpersuasive. Additionally, the Supplemental Accounting Agreement, a documented created subsequently to the Pinedale Contract for the sole purpose of allocating to and billing non-operator First Parties, requires each First party to take into account "gross revenue received by such party as a result of such *operations*" under the net profits interest leases. (ECF No. 35-4 at 4; ECF No. 35 at 22). Because Ultra's hedging gains do not result

[1] This reading of the Pinedale Contract is consistent with Wyoming law regarding the imposition of severance taxes on oil and gas production. Wyo. Stat. Ann. § 39-14-203(b)(iv) ("The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator.").

from operations under the net profits interest leases, the Supplemental Accounting Agreement does not include such gains in its allocating to and billing of the First Parties' successors.

The conclusion that the Pinedale Contract does not include Ultra's hedging proceeds comports with the relevant case law on the exclusion of hedging gains from net profits interests or other non-working oil and gas interests. *See Chastant*, 537 F. App'x at 565 (limiting the mineral lessor's royalty interest to the best market price of the gas at the mouth of the well or the oil on the leased property); *Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1231 (10th Cir. 1996) (stating that royalty payments are not due under production-type leases until gas is physically extracted from the leased grounds); *Diamond Shamrock Expl. Co. v. Hodel*, 853 F.2d 1159, 1161 (5th Cir. 1988) (ruling that royalty payments were due under a federal oil and gas lease only on gas actually produced and taken, not on take-or-pay payments); *Candelaria Indus. v. Occidental Petroleum Corp.*, 662 F. Supp. 1002, 1005 (D. Nev. 1984) (holding that a royalty agreement entitled the royalty interest holders only to profits realized through actual production of minerals from the property); *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 977 (Wyo. 1994) (stating that the net profits interest entitled the net profits interest holder to a share in the proceeds of oil and gas production only after those commodities had been physically removed from the mineral estate); *State v. Pennzoil Co.*, 752 P.2d 975, 981–82 (Wyo. 1988) (finding that the lease in issue's clear terms intended that royalty payments be made only after production from the lease—i.e. physical extraction of gas from the land and its sale—occurred).

In contrast, the Hartmans rely mainly on the case *In the Matter of the Appeal of Patriot Energy Resources, LLC*, an appeal before the Wyoming State Board of Equalization. (ECF No. 35 at 34–36). The Board found that proceeds from Patriot's hedge contracts were tied to its gas production and sales and could thus be included in its income assessed for severance taxes.

*In the Matter of the Appeal of Patriot Energy Resources, LLC*, Docket No. 2012-24, 7 ¶ 23. Patriot's records of its hedging and non-hedging oil and gas transactions were so commingled that the Board found it difficult to differentiate Patriot's regular income from its hedging income. *Id.* at 15 ¶ 61. Patriot's hedging transactions were thus unlike typical hedges that are purely financial, derivative transactions, prompting the Board to treat them as an integrated transaction between the gas producer and purchaser. *Id.* at 23 ¶ 94. In contrast to Patriot's hedges, no facts have been presented establishing that Ultra's hedging and non-hedging income are so intermingled so as to be one. Consequently, this particular case is inapplicable to this proceeding.

The Hartmans assert various counterarguments to the contention that the Pinedale Contract excludes Ultra's hedging gains in the calculation of their net profits interest, as well as that the cases supporting such an interpretation apply to their interest. The Hartmans make two principal arguments. First, they allege that the Pinedale Contract is silent on how to treat fixed price hedges in regards to calculating their net profits interest. This silence allegedly creates an ambiguity in the Pinedale Contract. *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1173 (10th Cir. 1999). (ECF No. 35 at 18 n. 75). Second, the Hartmans argue that their net profits interest is inherently different from royalty or take-or-pay interests and thus the cases involving those other interests do not apply to their net profits interest. (ECF No. 35 at 36 –40).

The Court is unpersuaded by the Hartmans' counterarguments for several reasons. It is true that silence on "a matter naturally within the scope of the contract" may give rise to ambiguity. *Cheyenne Mountain Sch. Dist. v. Thompson,* 861 P.2d 711, 715 (Colo. 1993); *see also Moncrief*, 174 F.3d at 1173. However, the Hartmans failed to present any evidence

suggesting that Ultra's hedging transactions were within the natural scope of the Pinedale Contract. Although it is conceivable that a fact issue may be raised without a fact witness, the Hartmans do not raise an argument that rises to such a level. At the time that the First Parties and Novi entered into the Pinedale Contract, 1954, the hedging of natural gas was not an extensive practice in the oil and gas industry. *See* C. A. "Cab" Baldwin, *Recent Changes in the Regulation of Commodity Sales and Derivatives*, ACCA DOCKET, Summer 1993, at 76, 76 ("This relatively isolated regulatory regime has expanded dramatically . . . throughout the past decade as the hedging schemes . . . in agricultural markets have been expanded into the financial and energy business sectors."). Instead, "oil producers vented or flared natural gas in the field or sold it to carbon-black plants for mere pennies per thousand cubic feet . . . ." ARLON R. TUSSING & BOB TIPPEE, THE NATURAL GAS INDUSTRY: EVOLUTION, STRUCTURE AND ECONOMICS 79 (2d ed. 1995). Accordingly, the Hartmans' first counterargument is neither supported by any evidentiary record nor persuasive in the context of the history of natural gas production.

As to the second counterargument, there are certainly differences between net profits interests, royalties and take-or-pay contracts. However, those differences do not preclude the applicability of case law finding that the calculations of those other interests do not include hedging gains or revenue to this case. A net profits interest may share similarities with royalty or other interests under the respective contracts creating those interests. *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 977 (Wyo. 1994) ("Coronado's net profit interest entitles it to a share of the proceeds from production in the oil and gas field. That interest is similar to a non-participating royalty interest."). A net profits interest may then be treated in a similar manner as another interest. Additionally, although net profits interests, royalty interests, and take-or-pay interests may be calculated differently, each type of interest is created and controlled by the underlying

contract. *See Cimarex Energy Co. v. Chastant*, 537 F. App'x 561, 565 (5th Cir. 2013); *Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1231 (10th Cir. 1996); *Diamond Shamrock Expl. Co. v. Hodel*, 853 F.2d 1159, 1161 (5th Cir. 1988); *Candelaria Indus. v. Occidental Petroleum Corp.*, 662 F. Supp. 1002, 1005 (D. Nev. 1984); *Ferguson*, 884 P.2d at 977; *State v. Pennzoil Co.*, 752 P.2d 975, 981–82 (Wyo. 1988). Accordingly, if the underlying contract does not include hedging gains or revenue in the calculation of the interest—as is the case for the Hartmans' net profits interest and the interests in the cases cited above—the type of non-working interest involved in the case does not matter.

Because the terms of the Pinedale Contract do not support the Hartmans' claim that proceeds Ultra received from its fixed-price hedges should be included in the calculation of their net profits interest under the Pinedale Contract, the Court finds no genuine dispute of material fact as to the Hartmans' hedging claim. Consequently, Ultra's motion for partial summary judgment is granted. Because the Hartmans' cross motion for summary judgment seeks the opposite outcome of Ultra's motion, the Hartmans' cross motion is denied.

**Conclusion**

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **May 16, 2017.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE